THE MCHATTIE LAW FIRM, LLC
Christopher J. McHattie
(Bar No. 035251987)
Michael V. Gattoni
(Bar No. 238152018)
550 West Main Street
Boonton, New Jersey 07005
Telephone:  973-402-5505
Facsimile:  973-400-4110
*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| DIEGO GARZON<br><br>*Plaintiff,*<br><br>v.<br><br>EXICURE, INC.; PAUL KANG; JIYOUNG HWANG; JUNG-SANG (MICHAEL) KIM; SARAH LONGORIA; JOHN DOES 1-10 (name being fictitious for individuals whose identities are currently unknown); and ABC ENTITIES 1-10 (names being fictitious for corporate or other legal entities whose identities currently remain unknown)<br><br>*Defendants.* | CASE NO.: 2:23-cv-20912<br><br>**COMPLAINT** |

Plaintiff, Diego Garzon ("Dr. Garzon" or "Plaintiff"), by and through his counsel, hereby alleges as follows:

## PARTIES

1.     Plaintiff Diego Garzon is an individual who was employed by Exicure, Inc. as the Vice President of Corporate Development and Strategy and resides in the State of New Jersey.

2.     Defendant Exicure, Inc. ("Exicure" or "Company") is an Illinois corporation having an address at 2430 Halsted St., Fl. 4, Chicago, Illinois, 60614.

3.     Defendant Paul Kang is an individual who acts as a board member and Chief Executive Officer of Exicure ("Mr. Kang"). Upon information and belief, Mr. Kang is a citizen of the United States and a New York resident.

4.     Defendant Jiyoung Hwang is an individual who acts as a board member and Chief Financial Officer of Exicure ("Ms. Hwang"). Upon information and belief, Ms. Hwang is a citizen of the Republic of Korea and a Korean resident.

5.     Defendant Jung-Sang (Michael) Kim is an individual who acted as Chief Executive Officer and Chief Financial Officer of Exicure and a Class II director of Exicure's board of directors ("Mr. Kim") before his departure with Exicure on August 18, 2023. Upon information and belief, Mr. Kim is a citizen of the United States and a regular resident of Illinois.

6.     Defendant Sarah Longoria is an individual who acted as Chief Human Resources and Compliance Officer of Exicure ("Ms. Longoria") before becoming a consultant for Exicure in or around May of 2023. Upon information and belief, Ms. Longoria is an Illinois resident.

7.     Upon information and belief, Exicure, Mr. Kang, Ms. Hwang, Mr. Kim and Ms. Longoria are affiliated persons who own, are owned by or are under substantially common ownership and who act in active concert with each other.

8.     Upon information and belief Exicure, Mr. Kang, Ms. Hwang, Mr. Kim and Ms. Longoria, or one and the others, caused and or directed the acts hereafter alleged.

9.     John Does 1-10, being fictitious names, are individuals whose true identities have not yet been discovered that have acted in active concert with Exicure, Mr. Kang, Ms. Hwang, and/or Mr. Kim or otherwise participated in the wrongful acts against Plaintiffs that are set forth herein.

10.    ABC Entities 1-10, being fictitious names, are entities whose true identities have not yet been discovered that have acted in active concert with Exicure, Mr. Kang, Ms. Hwang, and/or Mr. Kim or otherwise participated in the wrongful acts against Plaintiffs that are set forth herein.  Collectively, Exicure, Mr. Kang, Ms. Hwang, Mr. Kim, John Does 1-10 and ABC Entities 1-10 will be referred to as the "Defendants."

## JURISDICTION AND VENUE

11.     There is more than $75,000 in controversy and the parties are residents of different states.

12.     This Court has jurisdiction under 28 U.S.C. §1332.

13.     This Court has personal jurisdiction over each of the Defendants because each regularly does business in the state of New Jersey, employed an employee in the state of New Jersey and the causes of action hereinafter alleged arise out of the engagement of employment services out of the state of New Jersey.

14.     Venue is properly situated in this District under 28 U.S.C. § 1391(b)-(c), and/or 28 U.S.C. § 1400(a).

## FACTS COMMON TO ALL CLAIMS

15.     On or about June 23, 2020, Dr. Garzon executed an offer letter with Exicure (the "Offer Letter").

16.     At the time, Exicure was an early-stage biotechnology company focused on developing nucleic acid therapies targeting ribonucleic acid against validated targets. . . . this includes . . . developing therapeutics for neurology, immune-oncology, inflammatory disease and other genetic disorders based on our proprietary spherical nucleic acid, or SNA technology.

17.     At the time Plaintiff was hired, he: (a) was an accomplished biopharmaceutical executive with experience across research and development, clinical operations, medical affairs, sales, and business development; (b) was a successful problem solver with experience in leading and supporting portfolios in ten therapeutic areas such as CNS, and oncology in both US and international regions; and (c) had an extensive record of achievement in building and leading teams across small biotech, mid- and large-size pharmaceutical companies.

18.     Dr. Garzon joined Exicure as its Vice President of Business Development reporting directly to the CEO.

19.     Due to the precariousness of such a high-level position and the difficulty he would have if he had to find a replacement, Dr. Garzon negotiated for severance in the event that he was terminated or effectively terminated following a change in control of the Company or left the Company for good reason.

20.     The Offer Letter provides, *inter alia*:

> If you accept this offer, you will be employed as Vice President, Business Development reporting to David Giljohann, CEO.
>
> Termination in the event of a change-in-control: If your employment is terminated by the Company without Cause, or by you for Good Reason, in either case within 12 months following a Change in Control then in addition to other payments and benefits to which you may be eligible, the Company shall pay you continuation of twelve (12) months of your annual Base Salary, as in effect immediately prior to your termination of employment hereunder, payable during the 6-month period following your termination of employment in the form of salary continuation in accordance with the Company's normal payroll practices; you will also receive an annual cash bonus equal to your annual target bonus as set forth in Section 2(b) above for the year in which the termination of employment occurs, payable at the same time as annual cash bonuses are paid to senior management; all equity awards, to the extent outstanding as of immediately prior to your termination, will be (or will be deemed to have been) fully vested and exercisable as of immediately prior to the latter of: (1) the date of termination and (2) the date of the Change in Control.

21.     On or about July 13, 2020, Dr. Garzon executed an employment agreement with Exicure (the "Employment Agreement").

22.     The Employment Agreement provides, *inter alia*:

(c)      **Termination without Cause or for Good Reason in Connection with a Change in Control**. If Executive's employment hereunder shall be terminated by the Company without Cause, or by Executive for Good Reason, in either case within 12 months following a Change in Control then, in addition to the payments and benefits described in Section 4(b) and subject to Executive's execution and non-revocation of the release contemplated in Section 4(e) of this Agreement and Executive's continuing compliance with the Company's Confidential Information Agreement (as defined below):

(i)      The Company shall pay Executive continuation of twelve (12) months ("Benefit Period") of Executive's annual Base Salary, as in effect immediately prior to Executive's termination of employment hereunder, payable during the 6-month period following Executive's termination of employment in the form of salary continuation in accordance with the Company's normal payroll practices;

(ii)      The Company shall pay Executive an annual cash bonus equal to Executive's annual target bonus as set forth in Section 3(b) for the year in which the termination of employment occurs, payable by the later of (A) the same date as annual cash bonuses are paid to senior management for the calendar year in which Executive's

termination occurs; or (B) 30 days after the effective date of the release contemplated in Section 4(e);

(iii)      All equity awards, to the extent outstanding as of immediately prior to such termination, will be (or will be deemed to have been) fully vested and exercisable as of immediately prior to the latter of: (1) the date of termination and (2) the date of the Change in Control;

(iv)      If the Executive timely elects to receive continued coverage under the Company's group health care plan pursuant to the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended ("*COBRA*"), the Company shall pay the employer portion of applicable COBRA premium payments for the Executive's and, as applicable, Executive's dependents', continued health coverage under such plan (as in effect or amended from time to time) (the "*COBRA Subsidy*") until the earlier of: (1) twelve (12) months following the Executive's termination of employment, or (2) the date upon which the Executive obtains or becomes eligible for other health care coverage from a new employer or otherwise (such period referred to as the "*COBRA Subsidy Period*"). The Executive shall promptly inform the Company in writing when Executive obtains or becomes eligible for any such other health care coverage. The Executive shall be responsible for paying a share of such COBRA premiums during the COBRA Subsidy Period at active employee rates as in effect from time to time, and shall be responsible for the full unsubsidized costs of such COBRA coverage thereafter.

23.      The Employment Agreement further provides, *inter alia*:

"***Good Reason***" shall mean the existence of any of the following: **(i)** a material diminution in Executive's authority, duties, or responsibilities from those applicable to Executive as of the Effective Date. . .

24.      On or about June 9, 2022, Dr. Garzon executed an amended and restated employment agreement with Exicure (the "Amended and Restated Employment Agreement").

25.      The Amended and Restated Employment Agreement provides, *inter alia*:

Termination without Cause or for Good Reason in Connection with a Change in Control. If Executive's employment hereunder shall be terminated by the Company without Cause, or by Executive for Good Reason, in either case within 12 months following a Change in Control then, in addition to the payments and benefits described in Section 4(b) and subject to Executive's execution and non-revocation of the release contemplated in Section 4(e) of this Agreement and Executive's continuing compliance with the Company's Confidential Information Agreement (as defined below): (i) The Company shall pay Executive continuation of twelve (12) months ("Benefit Period") of Executive's annual Base Salary, as in effect immediately prior to Executive's termination of employment hereunder, payable during the 12-month period following Executive's termination of employment in the form of salary continuation in accordance with the Company's normal payroll practices; (ii) The Company shall pay Executive an annual cash bonus equal to Executive's annual target bonus as set forth in Section 3(b) for the year in which the termination of employment occurs, payable by the later of (A) the same date as annual cash bonuses are paid to senior management for the calendar year in which Executive's termination occurs; or (B) 30 days after the effective date of the release contemplated in Section 4(e); (iii) All equity awards, to the extent outstanding as of immediately prior to such termination, will be (or will be deemed to have been) fully vested and exercisable as of immediately prior to the latter of: (1) the date of termination and (2) the date of the Change in Control; (iv) If the Executive timely elects to receive continued coverage under the Company's group health care plan pursuant to COBRA, the Company shall pay the employer portion of applicable COBRA premium payments for the Executive's and, as applicable, Executive's dependents', continued health coverage under such plan (as in effect or amended from time to time) (the "COBRA Subsidy") until the earlier of: (1) twelve (12) months following the Executive's Separation Date, or (2) the date upon which the Executive obtains or becomes eligible for other health care coverage from a new employer or otherwise (such period referred to as the "COBRA Subsidy Period"). The Executive shall promptly inform the Company in writing when Executive obtains or becomes eligible for any such other health care coverage. The Executive shall be responsible for paying a share of such COBRA premiums during the COBRA Subsidy Period at active employee rates as in effect from time to time, and shall be responsible for the full unsubsidized costs of such COBRA coverage thereafter.

26.    On or about September 20, 2022, Dr. Garzon executed the first amendment to his employment agreement with Exicure (the "First Amendment").

27.    The First Amendment provides, *inter alia*:

Section 4 (d) (i) of the Executive Agreement is hereby and replaced in its entirety as follows: The Company shall pay Executive the equivalent of twelve (12) months of Executive's annual Base Salary, as in effect immediately prior to Executive's termination of employment hereunder, payable in a lump sum. This payment will

be paid within 30 days of the Effective Date of the Separation and Release Agreement. d. Section 4 (d) (iv) of the Executive Agreement is hereby and replaced in its entirety as follows: The Company shall pay a lump sum amount to assist the Executive with the cost of monthly COBRA premiums or to otherwise contribute to the cost of post-employment health insurance coverage ("Benefit Payment"). This amount shall be equivalent to twelve (12) months of the Company's contribution to health insurance, as per the plan that the Executive participated in immediately prior to termination and is payable within 30 days of the Effective Date of the Separation and Release Agreement.

28.     On or around February 24, 2023, a Change of Control of Exicure occurred (as that term is defined in Dr. Garzon's Employment Agreement) when CBI (a Korean company) acquired fifty one percent (51%) of Exicure.

29.     Shortly thereafter, in or around March of 2023, the now majority shareholder, CBI, announced that "CBI would transition Exicure out of Biotechnology."

30.     At least as early as March of 2023, Dr. Garzon communicated that his separation from the Company was necessary.

31.     In April of 2023, Exicure began transitioning out of the biotech and life sciences spaces.

32.     In or around that same time, upon information and belief, Exicure began transitioning into the arts and entertainment field, a field with which Dr. Garzon had no previous experience.

33.     Dr. Garzon continued to have discussions with Exicure's HR consultant, Ms. Longoria, and then CEO, Mr. Kim, pertaining to Exicure's future and the disposal of Exicure's life sciences assets and exit from the biotech and life sciences industries, all of which were essential components of Dr. Garzon's employment and his exit from the Company.

34.     On more than one occasion after the Change of Control, Dr. Garzon had discussions with Mr. Kim and Exicure's HR consultant, Ms. Longoria, regarding the material change in his

role with Exicure, his exit from the Company and the severance he would be entitled to as a result of a Change in Control.

35.     The Change in Control and Exicure's exit from the biotech and life sciences industries is an occurrence not capable of cure.

36.     Exicure's exit from the biotech and life sciences business resulted in a diminution of Dr. Garzon's authority, duties, and responsibilities from those applicable to Dr. Garzon when he was hired.

37.     Such diminution of Dr. Garzon's authority, duties, and responsibilities constitutes Good Reason as that term is defined in Dr. Garzon's Employment Agreement.

38.     Accordingly, pursuant to Dr. Garzon's Employment Agreement and amendments thereto, Dr. Garzon is entitled to:

> a.  Termination without Cause or for Good Reason in Connection with a Change in Control. If Executive's employment hereunder shall be terminated by the Company without Cause, or by Executive for Good Reason, in either case within 12 months following a Change in Control then, in addition to the payments and benefits described in Section 4(b) and subject to Executive's execution and non-revocation of the release contemplated in Section 4(e) of this Agreement and Executive's continuing compliance with the Company's Confidential Information Agreement (as defined below): (i) The Company shall pay Executive the equivalent of twelve (12) months of Executive's annual Base Salary, as in effect immediately prior to Executive's termination of employment hereunder, payable in a lump sum. This payment will be paid within 30 days of the Effective Date of the Separation and Release Agreement; (ii) The Company shall pay Executive an annual cash bonus equal to Executive's annual target bonus as set forth in Section 3(b) for the year in which the termination of employment occurs, payable by the later of (A) the same date as annual cash bonuses are paid to senior management for the calendar year in which Executive's termination occurs; or (B) 30 days after the effective date of the release contemplated in Section 4(e); (iii) All equity awards, to the extent outstanding as of immediately prior to such termination, will be (or will be deemed to have been) fully vested and exercisable as of immediately prior to the latter of: (1) the date of termination and (2) the date of the Change in Control; (iv) The Company shall pay a lump sum amount to assist the Executive with the cost of monthly COBRA premiums or to otherwise contribute to the cost of post-employment health insurance coverage ("Benefit Payment"). This amount shall be equivalent to twelve (12) months of the Company's contribution to health

insurance, as per the plan that the Executive participated in immediately prior to termination and is payable within 30 days of the Effective Date of the Separation and Release Agreement.

39.     In discussions with Mr. Kim and Exicure's HR consultant, Ms. Longoria, Exicure acknowledged the elimination of Dr. Garzon's responsibilities and Mr. Kim assured Dr. Garzon that he would receive severance.

40.     In reliance upon these representations, Dr. Garzon continued working, oversaw the winding down and sale of the Company's life sciences businesses and assets in good faith.

41.     The Company's life sciences business, as an ongoing concern, was concluded in or around May of 2023.

42.     On June 9, 2023, Dr. Garzon provided Mr. Kim with written notice of his Good Reason to leave the Company in connection with a Change in Control.

43.     Prior to June 30, 2023, Exicure and Dr. Garzon agreed that Dr. Garzon would be separated from Exicure and agreed to pay Dr. Garzon severance in accordance with his Employment Agreement.

44.     Prior to June 30, 2023, Exicure and Dr. Garzon agreed that a Change of Control had occurred.

45.     Prior to June 30, 2023, Exicure and Dr. Garzon agreed that Dr. Garzon had Good Reason to Leave the Company.

46.     Prior to June 30, 2023, Exicure and Dr. Garzon agreed that Dr. Garzon was no longer needed by Exicure.

47.     Prior to June 30, 2023, Exicure and Dr. Garzon agreed that Exicure would no longer pursue life science business.

48.     Prior to June 30, 2023, Exicure accepted Dr. Garzon's resignation and began the steps necessary to prepare a draft of a separation and release agreement embodying same.

49.     Prior to June 30, 2023, Exicure acknowledged that it had effectively terminated Dr. Garzon and began the steps necessary to prepare a draft of a separation and release agreement embodying same.

50.     At no time, ever, did Exicure or Mr. Kim, propose a "cure" to the Change in Control or Dr. Garzon's Good Reason.

51.     On or around July 7, 2023, Exicure sent a first draft of a separation and release agreement to Dr. Garzon, which acknowledged Dr. Garzon's right to severance payment (the "Separation and Release Agreement").

52.     Dr. Garzon, through counsel, proposed several changes to the proposed Separation and Release Agreement conforming it to the Employment Agreement.

53.     Notably, Dr. Garzon, through counsel, proposed several changes to the severance payment sections of the Separation and Release Agreement integrating severance payment obligations resulting from a termination for Good Reason as a result of a Change in Control consistent with the Employment Agreement.

54.     Those changes were accepted by the Company.

55.     Thereafter, communication from Exicure and its counsel was sporadic.

56.     In the interim, the leadership of Exicure including its CEO and CFO changed.

57.     On July 28, 2023, forty-eight days after Dr. Garzon provided the company with his first notice, Dr. Garzon, in an abundance of caution, reiterated his first notice via letter that he was resigning for Good Reason as a result of a Change in Control, as all of his former duties had been eliminated by the Company.

58.     Dr. Garzon offered to complete, as a consultant, all remaining projects that would be benefited by his participation and effort.

59.     Exicure failed and refused to implement the terms of Dr. Garzon's Employment Agreement in the Separation and Release Agreement.

60.     On or around August 21, 2023, after numerous previous communications went unanswered, Dr. Garzon's counsel sent a letter to Exicure requesting the status of the Separation and Release Agreement.

61.     On or around August 24, 2023, having not received the courtesy of a response from Exicure, Dr. Garzon's counsel sent a second letter to Exicure requesting the status of the Separation and Release Agreement.

62.     On or around September 8, 2023, Dr. Garzon's counsel received a letter from counsel for the Company alleging, for the first time, that Dr. Garzon had not given proper notice of the diminution in his duties and therefore was not entitled to severance.

63.     Exicure has not and has never given an indication that it intends to resume any life sciences or biotech business.

64.     Exicure has not and has never given an indication that it had ongoing full time duties available for Dr. Garzon to perform or that it desired Dr. Garzon to stay on as an employee.

65.     At all times, Dr. Garzon has communicated openly and performed his duties for the Company and exercised his rights under his Employment Agreement in good faith.

66.     Dr. Garzon complied in good faith with his obligations under his Employment Agreement to provide notice of Good Reason.

67.     Exicure has not identified any prejudice it may have suffered as a result of Dr. Garzon's method of resignation.

68.     Not only did Dr. Garzon have Good Reason to resign, but by eliminating all of his responsibilities, Exicure effectively terminated Dr. Garzon's employment without cause.

69.     Despite no longer having any biotech or life sciences business and no work for Dr. Garzon to perform, Exicure has taken the position that Dr. Garzon is not terminated and he did not have Good Reason to leave in a cynical and bad faith ploy to deny him the severance that he negotiated in anticipation of an event such as this.

## **Personal Liability**

70.     The foregoing allegations are integrated by reference and in addition to the information and correspondence set forth below which applies to the individual defendants.

71.     For all times relevant hereto, Defendants Mr. Kim and Ms. Longoria, were either officers, directors or agents of Exicure who provided "advice, consent, affect or consultation" on the material decisions affecting Dr. Garzon's rights under his Employment Agreement as a result of him leaving Exicure.

72.      From and after August 18, 2023, Defendants Ms. Hwang and Mr. Kang were either officers, directors or agents of Exicure who provided "advice, consent, affect or consultation" on the material decisions affecting Dr. Garzon's rights under his Employment Agreement as a result of him leaving Exicure.

73.     Ms. Longoria had direct responsibility for human resources functions, including but not limited to, the final pay of departing executives such as Dr. Garzon. In addition, as set forth in more detail below, Ms. Longoria was directly and deeply involved in negotiation of Dr. Garzon's exit, and the exit of all prior Exicure executives, each of which were forced, based on the "advice, consent, affect or consultation" from Ms. Longoria to accept severance packages that breached and departed from what those executives were entitled to.

74.     At the times relevant to their respective participation, Mr. Kim, Ms. Hwang and Mr. Kang were the decision makers who consciously decided not to honor Dr. Garzon's Employment Agreement and not to fulfill Exicure's severance obligations with Dr. Garzon.

75.     Upon information and belief Mr. Kim, Ms. Hwang and Mr. Kang were directly and deeply involved in negotiation of Dr. Garzon's exit and the exit of all prior Exicure executives, each of which were forced, based on the "advice, consent, affect or consultation" of Ms. Longoria to accept severance packages that breached and departed from what those executives were entitled to.

76.     Exicure, Mr. Kim, Ms. Longoria, Ms. Hwang and Mr. Kang made conscious decisions not to fulfil Exicure's obligations pursuant to the Employment Agreement and pay Dr. Garzon all final compensation and benefits he was owed.

77.     On July 23, 2023 Mr. Kim wrote:

If we have a new Separation and Release Agreement, I need to provide the revised contract to the board at least a few days before the meeting after Akin's review. I am wondering if we really need to go through that trouble to make a new contract for you since I did not find critical issues in the old contract. This is a contract drafted by Baker with minor modifications by Akin and reviewed/approved by the board. Dozens of executives have already accepted this contract. The real important thing is how much you get as your separation package, not the contract itself. I do not see a point that we incur unnecessary legal expenses of Akin to revise the contract and cause the board members to pay extra attention to your package.
                                    * * *

Please remember that I am trying to give you the full CIC severance amount while NO one had 100% of CIC amount. Please help me to negotiate with the board and deliver you this package.

78.     On July 23, 2023 Mr. Kim wrote:

From: Michael Kim <mkim@exicuretx.com>
Sent: Thursday, August 10, 2023 4:46 PM
To: Diego Garzón <dgarzon@exicuretx.com>
Subject: Re: Your Contract
Hi Diego,

I reviewed the changes you made.

It is hard for me to accept the additional language on Non-Disparagement.

The purpose of this clause is asking all parties to be discreet about their statements regarding the other party. I think the additional language you wrote defeats the purpose of this clause.

If you agree to delete the additional language, which is

> "The foregoing prohibition shall "sunset" and be of no further effect two years from the date of this Agreement. Notwithstanding the foregoing, neither party shall violate this provision as a result of: (a) truthful statements; or (b) verbal conversations between individuals without a showing of an intent to injure, embarrass or harm the Company's or Employee's reputation." (the "Non-Disparagement Clause")

I will take this to the board for approval.

Michael

79.     A Non-disparagement clause is not provided for in the Employment Agreement.

80.     Mr. Kim, for all relevant times, was the central executive, as an officer and board member, charged with implementing and executing that decision, even though Mr. Kim knew that Exicure was not honoring its Employment Agreement obligations to, and pay of, Dr. Garzon as required by law and his Employment Agreement.

81.     In August 2023, Defendants Ms. Hwang and Mr. Kang, already board members of Exicure, became officers, taking over from Mr. Kim.

82.     Mr. Kim, Ms. Longoria, Ms. Hwang and Mr. Kang, were all informed of Dr. Garzon's rights under the Employment Agreement, at a minimum, by Dr. Garzon.

83.     Mr. Kim, Ms. Longoria, Ms. Hwang and Mr. Kang, were all informed of Exicure's legal obligations, by Ms. Longoria and outside counsel for Exicure.

84.     Upon information and belief, Ms. Longoria, Ms. Hwang and Mr. Kang had significant roles in developing the strategy to treat Dr. Garzon's separation from Exicure as voluntary and avoiding any obligation to pay Dr. Garzon severance, and thereafter implemented

and executed a decision, as they had with all prior departing executives, not to pay Dr. Garzon all of the final compensation and benefits he was owed pursuant to his Employment Agreement.

## COUNT I
## BREACH OF CONTRACT

85.     Plaintiff repeats and realleges the allegations set forth above as if set forth at length herein.

86.     Exicure and Dr. Garzon entered in the Offer Letter, Employment Agreement, Amended and Restated Employment Agreement and First Amendment.

87.     Dr. Garzon substantially performed his obligations thereunder.

88.     Pursuant to the dually executed Employment Agreement, and amendments thereto, Plaintiff is entitled to severance payment from Exicure as his employment was terminated without Cause and/or he resigned for Good Reason in connection with a Change in Control.

89.     Defendant Exciure has breached their obligations under and pursuant to, *inter alia*, the Offer Letter, Employment Agreement, Amended and Restated Employment Agreement and First Amendment.

90.     Defendant Exicure's conduct constitutes a material breach of Defendant Exicure's contractual obligations to Dr. Garzon.

91.     Prior to filing this Complaint, Exicure and Defendants were notified of their breach on multiple occasions.

92.     Defendant Exicure failed to pay Plaintiff the severance amount in accordance with its agreements with Plaintiff.

93.     As a direct and proximate result of Defendant Exicure's conduct, and as set forth more fully above, Defendant Exicure breached the Offer Letter, Employment Agreement,

Amended and Restated Employment Agreement and First Amendment and Dr. Garzon has suffered, and will continue to suffer, damages.

## COUNT II
## BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

94.     Plaintiff repeats and realleges the allegations set forth above as if set forth at length herein.

95.     The Offer Letter, Employment Agreement, Amended and Restated Employment Agreement and First Amendment are subject to the Covenant of Good Faith and Fair Dealing.

96.     Plaintiff negotiated for severance pay and benefits in the event that his employment was terminated or he was effectively terminated following a change in control of the Company.

97.     Defendant Exicure voluntarily left the biotech and life sciences field and eliminated all of Plaintiff's duties, effectively terminating his employment, following a change in control.

98.     At all times, Plaintiff performed his duties and communicated with Defendant Exicure in good faith.

99.     Defendant Exicure's denial of severance, to the extent it may be consistent with the wording of the Offer Letter, Employment Agreement, Amended and Restated Employment Agreement or First Amendment, nevertheless violates the covenant of good faith and fair dealing and improperly denies Plaintiff the benefit that he negotiated and reasonably expected to receive.

## COUNT III
## VIOLATIONS OF NEW JERSEY LAW AGAINST DISCRIMINATION
## (N.J.S.A. 10:5-12.8)

100.     Plaintiff repeats and realleges the allegations set forth above as if set forth at length herein.

101.     The New Jersey Law Against Discrimination ("NJLAD") applies to all employers and employees in the State of New Jersey.

102.    Dr. Garzon is an employee in the state of New Jersey.

103.    Exicure is an employer who required Dr. Garzon to agree to the Non-Disparagement Clause.

104.    Upon information and belief, Exicure's intent was to require Dr. Garzon to agree to: "a provision . . . which has the purpose or effect of concealing the details relating to a claim of discrimination, retaliation, or harassment."

105.    Specifically, Exicure did not want Dr. Garzon testifying about or informing labor departments of his treatment or the treatment of the other executives.

### COUNT IV
### VIOLATIONS OF THE ILLINOIS WAGE PAYMENT AND COLLECTION ACT
### (820 ILCS 115)

106.    Plaintiff repeats and realleges the allegations set forth above as if set forth at length herein.

107.    The Illinois Wage Payment and Collection Act (the "Illinois Act") applies to all employers and employees in the State of Illinois.

108.    Exicure, Inc. is an employer in the state of Illinois.

109.    The Illinois Act defines "wages" as:

> For all employees, other than separated employees, "wages" shall be defined as any compensation owed an employee by an employer pursuant to an employment contract or agreement between the 2 parties, whether the amount is determined on a time, task, piece, or any other basis of calculation. Payments to separated employees shall be termed "final compensation" and shall be defined as wages, salaries, earned commissions, earned bonuses, and the monetary equivalent of earned vacation and earned holidays, and any other compensation owed the employee by the employer pursuant to an employment contract or agreement between the 2 parties.

110.    Dr. Garzon in contractually entitled to severance payment pursuant to the Employment Agreement executed by the parties.

111.    Exicure has failed to properly pay Dr. Garzon pursuant to his Employment Agreement.

112.    Pursuant to the Illinois Act, Dr. Garzon is entitled to damages equal to five percent (5%) of the underpayment, per month (calculated from the date of the underpayment) for each month during which wages or final compensation remain unpaid.

113.    Pursuant to the Illinois Act, damages are payable to the Dr. Garzon and continue to accrue, without limitation, until the amount found owing is paid.

114.    Pursuant to the Illinois Act, any officers of a corporation or agents of an employer who knowingly permit such employer to violate the Illinois Act shall be personally liable for an employee's unpaid wages or final compensation and any fees or penalties assessed.

115.    In accordance with the foregoing, upon information and belief, Mr. Kang, Ms. Hwang, Mr. Kim and Ms. Longoria knowingly permitted Exicure to violate the Illinois Act and should be personally liable for Dr. Garzon's unpaid wages or final compensation and any fees or penalties assessed.

116.    Prior to filing this Complaint, Defendants were notified of their breach on multiple occasions.

117.    Defendants failed to pay Plaintiff the severance amount in accordance with their agreement with Plaintiff.

118.    As a result of Exicure's failure, Dr. Garzon has suffered, and will continue to suffer, damages.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays that this Court;

      A.      Enter Judgment in favor of Plaintiff on all the foregoing Counts of this Complaint;

      B.      Enter Judgment against Defendants and in favor of Plaintiff for violations of the New Jersey Law Against Discrimination and the Illinois Wage Payment and Collection Act;

      C.      Award Plaintiff all severance pay and benefits as required by the Employment Agreement;

      D.      Award Plaintiff reasonable attorneys' fees, costs and disbursements, as provided in, *inter alia*, the New Jersey Law Against Discrimination and the Illinois Wage Payment and Collection Act;

      E.      Award Plaintiff statutory, enhanced and liquidated damages as provided in such applicable law and regulations, including reasonable attorneys' fees, costs and disbursements, as provided in, *inter alia*, the New Jersey Law Against Discrimination and the Illinois Wage Payment and Collection Act; and

      F.      Enter such other and further relief to which Plaintiff may be entitled as a matter of law or equity, or which the Court determines to be just and proper.

THE MCHATTIE LAW FIRM

By: */s/ Christopher J. McHattie*
      Christopher J. McHattie, Esq.
550 West Main Street
Boonton, NJ 07005
(973) 402-5505
cmchattie@mchattielaw.com
*Attorneys for Plaintiff*

Dated: October 5, 2023